Mei **YING FONG**, Petitioner,

v.

John **ASHCROFT**, Attorney General of the United States of America, Respondent.

**No. 03 Civ. 7261(AKH).**

United States District Court, S.D. New York.

April 30, 2004.

Theodore N. Cox, New York City, for petitioner.

Sean Cenawood, James Loprest, Assistant U.S. Attorneys, S.D.N.Y., New York City, for respondents.

## OPINION AND ORDER GRANTING HABEAS CORPUS FOR RETURN OF ALIEN

HELLERSTEIN, District Judge.

Petitioner Mei Ying Fong petitions for habeas corpus to order her returned to the United States. She complains that the Bureau of Immigration and Customs Enforcement ("ICE") removed her from the United States in less than 72 hours from the time she was arrested, contrary to applicable Regulations and in violation of a court order, and that she will be prejudiced in seeking relief from ICE unless she is returned to the United States. I grant her petition.

*Background*

Mei Ying Fong is a 56–year–old Chinese citizen. She entered the United States on December 18, 1995, on a temporary non-immigrant visitor's visa, which permitted her to stay in the country for six months, until June 17, 1996.[1]

On March 12, 1996, before her visa expired, Fong applied for asylum, claiming that she would be placed in danger if she were to return to China. She alleged that she had released a woman from custody to prevent a forced abortion of her seven-month old fetus under the government's one-child policy, that she was jailed for three months by the Chinese government, and that she feared future retaliation if she were to return to China.

---

1. The visa contained two expiration dates, a printed date of December 27, 2004, and a stamped date of June 17, 1996. Petitioner does not dispute that the earlier, stamped date was controlling.

Fong's affidavit in support of her petition for habeas corpus alleges that her application for asylum was prepared by Mandy Chen, a travel agent, that she did not authorize him to file the application, and that despite assuring Fong that her application would not be submitted, he nevertheless submitted it on March 20, 1996. Fong alleges that Chen set down on the application a false address, One East Broadway, # 3C, as Fong's, and also recorded the travel agency's address, 17 East Broadway, 2nd Floor, and that consequently she did not receive any of the notices that were given in response to the application.

The INS scheduled an interview with Fong regarding her asylum application for April 25, 1996, but adjourned it to May 28, 1996 at Fong's request. Fong claims in her affidavit that the travel agency forged the request for adjournment and that she never saw or signed it. She did not appear on May 28, 1996, and her application for asylum was denied.

Almost a year and a half later, on October 31, 1997, the INS issued Fong a Notice to Appear in Removal Proceedings (NTA). The NTA failed to state the date, time, or place of any scheduled hearings. A hearing on Fong's removal was held on February 11, 1998, although there is no evidence that Fong was given notice of that hearing date. Fong did not appear, and the Immigration Judge issued an in absentia removal order, ordering that Fong be removed from the United States for the reasons stated in the NTA. The record does not reflect that notice of the order of removal was given to Fong.

Over a year and a half later, on September 23, 1999, the INS gave notice to Fong to appear for deportation on November 2, 1999, mailing the notice to One East Broadway, # 3C, the address listed as Fong's on the asylum application. Fong did not appear, and nothing occurred with regard to her deportation until September 17, 2003, in the context of an altogether different proceeding.

On June 17, 2002, Fong's daughter, Oi Ying Chan, an American citizen, filed an I–130 petition to classify Fong as the immediate relative of a United States citizen. Based on that petition, Fong filed, on October 10, 2002, a Form I–485, an application for an adjustment of her immigration status to that of a lawful permanent resident. On June 23, 2003, ICE, a successor to the INS,[2] gave notice to Fong to appear in its New York office on August 21, 2003, for a hearing on the adjustment application, mailing the notice to the address that Fong had listed on her adjustment application, 90–26 51st Avenue, Elmhurst, New York.

Fong failed to appear on August 21, 2003, but she requested a rescheduling, and she duly appeared on the rescheduled date, September 17, 2003. No hearing on Fong's adjustment application was held. Instead, ICE took Fong into custody for the purpose of removing her from the country.

On the evening of September 17, 2003, the day she was taken into custody, Fong's counsel filed the instant habeas corpus petition under 28 U.S.C. § 2241, bringing it by Order to Show Cause. I received it in Chambers the morning of September 18,

---

**2.** On March 1, 2003, the INS ceased to exist. Its functions were assumed by two agencies in the Department of Homeland Security: Immigration and Customs Enforcement (ICE), generally responsible for enforcing removal orders, and Citizenship and Immigra-

tion Services (CIS), generally responsible for processing adjustment and naturalization applications. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, § 471(a), 116 Stat. 2135, 2205 (Nov. 25.2002).

2003, and, in order to hear the government as well, scheduled a hearing for 3:00 p.m. the same day. Sometime after 1:00 p.m., however, the Assistant United States Attorney informed my Chambers by telephone that Fong was to be put on an airline scheduled for departure to Hong Kong at 1:55 p.m. that same day. When it appeared that an informal effort to defer her departure until after the 3:00 p.m. hearing would not succeed, at 1:35 p.m., I signed the Order to Show Cause, ordering a temporary stay of petitioner's removal pending a hearing. But the order was not heeded; ICE officials informed the parties that the plane was sealed and ready for take-off. The airplane departed on schedule, at 1:55 p.m., with Fong aboard.

Counsel appeared in court that afternoon without Fong, and again on December 22, 2003 and February 9, 2004. I now grant the petition, for the reasons discussed below.

*The Illegality of Fong's Removal*

1. Denial of Due Process—Removal in Contravention of Regulations

■ The Bureau's governing regulations provide that "[a]n alien taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his or her consent." 8 C.F.R. § 241.22. Fong was taken into custody on September 17, 2003, and removed from the United States the day after, well short of the 72–hour period provided by the regulations. The government argues that the 72–hour requirement applies to cases of exclusion, not removal, and Fong was removed, not excluded, from the United States. The government's argument is without merit.

The 72–hour requirement is encoded in two sections of the Code of Federal Regulations: 8 C.F.R. § 241.22, dealing with aliens subject to exclusion, and *id.* § 241.33(b), dealing with aliens subject to deportation. Prior to 1996, immigrations

hearings were classified as either "deportation" or "exclusion" proceedings. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which eliminated this distinction, effective April 1, 1997, in favor of a single set of "removal" proceedings. *See* IIRIRA § 304(a), Pub.L. No. 104–208, 110 Stat. 3009 (codified at 8 U.S.C. § 1229a (1999)); *Rojas–Reyes v. INS,* 235 F.3d 115, 120–21 (2d Cir.2000) (IIRIRA "classif[ied] as 'removal' proceedings the previously separate 'deportation' and 'exclusion' proceedings"); *United States v. Pantin,* 155 F.3d 91, 92 (2d Cir.1998). The existing regulations governing deportations of "Excluded Aliens" and "Aliens in the United States" were carried forward, but only "For Hearings Commenced Prior to April 1, 1997." *See* 8 C.F.R. §§ 241.20, 241.30. In addition, a third set of regulations was promulgated, governing removal proceedings generally under IIRIRA, without distinction between those aliens who formerly would have been classified as excludable and those who had entered the United States lawfully but had otherwise become subject to deportation. *See id.* §§ 241.1–241.15.

■ The new set of Regulations did not provide a time period before which an alien who had come into the government's custody could not be removed. The government argues that there is no longer a 72–hour requirement for hearings commenced after April 1, 1997. I decline to accept the argument. Congress intended by the IIRIRA to merge the separate provisions for excludable and deportable Aliens. There is no suggestion in the statutory or regulatory history that a change to the 72–hour rule was intended. The government's argument, that there should be no time limit whatever before the government can physically remove an alien from the United States, would raise serious due process implications. Presumably, under the government's argument, the

agency could make a determination of removal and then deport the alien two minutes later, leaving the alien no opportunity even to file an appeal.

There is no question that the policy embodied in the 72–hour requirement of 8 C.F.R. §§ 241.22 and 241.33(b) gives expression to the Fifth Amendment's due process mandates. Indeed, the INS said so itself; in adopting the rule, the INS explained that it was intended "to ensure that due process is accorded the detainee." 51 Fed.Reg. 23,041 (June 25, 1986). Just as the Constitution requires the government to afford notice of any action against an alien, so too it requires an opportunity for the alien to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Fuentes–Argueta v. INS*, 101 F.3d 867, 872 (2d Cir.1996); *United States v. Perez–Valdera*, 899 F.Supp. 181, 184 (S.D.N.Y.1995). The opportunity to be heard must be "meaningful," *Nazarova v. INS*, 171 F.3d 478, 482 (7th Cir.1999), that is, an "opportunity ... granted at a meaningful time and in a meaningful manner." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). A nearly instantaneous removal cannot provide such an opportunity. And, as the Second Circuit has made clear, *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991); *Waldron v. INS*, 17 F.3d 511 (2d Cir.1993), immigration regulations which are derived from and intended to protect constitutional rights are to be liberally applied. *Waldron* indicates that I must accord greater weight to a regulation grounded in "a fundamental right derived from the Constitution or a federal statute, ... even when the regulation requires more than would the specific provision of the Constitution or statute that is the source of the right." *Id.* at 518; *see also Zadvydas v. Davis*, 533 U.S. 678, 689–90,

121 S.Ct. 2491, 150. L.Ed.2d 653 (2001) (immigration statute which sets no time limits must be read in a manner reflecting due process limitations).

In *Gonzalez–Julio v. INS*, 34 F.3d 820 (9th Cir.1994), a ten-day deadline for filing appeals to the Board of Immigration Appeals was held to violate the Due Process clause as applied to Hawaiian residents. The Court of Appeals ruled, quoting from the Supreme Court decision in *Logan*, that "it is fundamentally unfair to require [the alien] to file an appeal within such a short period of time because he is forced to mail his notice of appeal from Hawaii and he has no control over the mail nor over when the Office of the Immigration Judge files the appeal after receipt." *Id.* at 823. Ten days was thus deemed insufficient time to request an opportunity to be heard, even though the alien was aware of the immigration court's adverse decision and could have been prepared to appeal it.

■ Fong came to the Bureau believing that she would be pursuing her application for an adjustment in status. That was the purpose stated in the Bureau's notice. Regardless whether her arrest and placement into custody was lawful (to be discussed later in this opinion), she was entitled to due process in her right to challenge the Bureau's actions against her. The 72–hour rule existed to preserve such rights. The Bureau's failure to abide by those regulations, or to offer a constitutionally "meaningful" substitute, *Logan*, 455 U.S. at 437, 102 S.Ct. 1148, violated Fong's right to due process of law.

In cases where the immigration agency failed to adhere to its own regulations, and the regulations in question were derived from and intended to bolster constitutional principles, *Montilla* and *Waldron* hold that relief is automatically warranted, and the alien need not show prejudice:

We conclude, therefore, that when a regulation is promulgated to protect a fun-

damental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required. This may well be so even when the regulation requires more than would the specific provision of the Constitution or statute that is the source of the right.

■ *Waldron*, 17 F.3d at 518; *see also Montilla*, 926 F.2d at 169. Prejudice, however, is clear, for Fong's removal impedes her ability to consult with counsel and pursue administrative remedies. Indeed, the government concedes that she has such remedies, for it complains that she failed to exhaust them. She could also, for instance, contest her removal order, administratively and by habeas corpus, or advance her adjustment application. This will be the purpose of Fong's return to this country. In this case, the Bureau failed to adhere to the 72–hour requirement, which was promulgated in order to protect the due process rights of prospective deportees. Accordingly, I must invalidate Ms. Fong's removal.

## 2. Violation of This Court's Order

I issued an order staying Fong's removal on September 18, 2003, at 1:35 p.m., twenty minutes before her scheduled departure. The government was aware of my order, having informed me of her scheduled departure time in order that the 3:00 p.m. hearing that I had scheduled would not become academic. According to the government, the only reason that the Order was not complied with was that the airplane had been "sealed" and was ready for departure.

■ "It is well settled that the courts of the United States have the inherent and statutory (28 U.S.C. § 1651) power and authority to enter such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise." *Mississippi Valley Barge Line Co. v. United States*, 273 F.Supp. 1, 6 (E.D.Mo. 1967) (three-judge panel), *aff'd* 389 U.S. 579, 88 S.Ct. 692, 19 L.Ed.2d 779 (1968). The decision of the immigration officials not to remove Fong from the airplane while it (presumably) was still at the gate "thwarted and interfered with" the lawful order of the district court. *Id.* That decision by the immigration officials also disregarded the Bureau's governing regulations, which require ICE to give effect to a federal court's stay of an order of removal. 8 C.F.R. § 241.3(c). As the Assistant United States Attorney stated at the hearing that went forward at 3:00 p.m. on September 18, the district court had the authority to order Fong returned to the United States to continue her legal proceedings, in compliance with the stay Order of September 18, 2003. *See also United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained"); *Henderson v. Office of Thrift Supervision*, 135 F.3d 356, 360 (5th Cir.1998) (quoting *Mississippi Valley* ).[3] Fong should

**3.** *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995), held that a federal court may stay a deportation order under the All Writs Act, 28 U.S.C. § 1651. Although *Kyei v. INS*, 65 F.3d 279 (2d Cir.1995), limited *Michael* by holding

that "before an alien can seek a stay of deportation under the All Writs Act," the alien "must pursue … all plausible avenues of temporary relief established by the immigration statute and regulations," *id.* at 284, that

promptly be returned to the jurisdiction of this court, to comply with the Order of this court.

### 3. Inadequate Notices as Violations of Fong's Due Process Rights

■ Notice and hearing are fundamental aspects of the constitutional requirement of due process of law under the Fifth Amendment. The Supreme Court has framed the requirement as follows: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. The requirement of notice and hearing applies to in absentia deportation proceedings. *See Fuentes–Argueta*, 101 F.3d at 872; *Perez–Valdera*, 899 F.Supp. at 184.

■ Thus, pursuant to 8 U.S.C. § 1229(a)(1), the agency is required to give an alien in removal proceedings written notice, either in person or by mail, in the form of a "Notice to Appear." The NTA must state "[t]he time and place at which the proceedings will be held," 8 U.S.C. § 1229(a)(1)(G)(i), and give notice of any changes in the time or place of the proceedings. *Id.* § 1229(a)(2). If such notice has been provided, and the alien does not appear, the alien "shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable." *Id.* § 1229a(b)(5)(A).

Clearly, the Bureau failed to meet its requirements under the statute. The NTA did not state the time and place of the removal proceedings against Fong. There is no evidence in the administrative record that Fong was given notice of the February 11, 1998 scheduled removal hearing. The notice thus was not "reasonably calculated" to afford Fong an opportunity to be present at her hearing. *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. This deficiency alone is sufficient to vitiate Fong's order of deportation.

The statute provides for one exception to the notice requirement. The NTA must specify, under § 1229(a)(1)(F), that the alien is required to provide his or her address and telephone number to the Agency. If it does, and if the alien fails to do so, § 1229a(b)(5)(B) provides that no notice is necessary. That exception is essentially repeated in § 1229(a)(1)(F)(iii) and (a)(2)(B). The government argues that Fong did not satisfy this requirement. This argument misses the point, however; the point is not that no notice was provided, but that the notice was deficient, because it did not state the date, time, and place of the hearing. Even if the alien's failure to provide an address obviates the Agency's requirement to mail an NTA to the appropriate location, it does not dispense with the Agency's obligation to notify the alien of the time and place of any scheduled proceedings. *See, e.g., In re G–Y–R*, 23 I & N Dec. 181, 2001 WL 1515819, 2001 BIA Lexis 20, at *15–*16, *21–*24 (BIA 2001) (alien's § 1229(a)(1)(F) address obligation does not cure defective notice; alien's 8 U.S.C. § 1302 address obligation is irrelevant in this context, because

holding was limited to cases where the alien's claim was based "on the ground that the law of the circuit of his or her residence provides a colorable claim for relief, while the law of the circuit in which he or she is being administratively processed does not." *Id.* Further,

the issue is inapposite; here, the stay was already issued (in an instance where, as discussed below, exhaustion of remedies was essentially impossible), and the question is whether an order may be issued enforcing the stay.

§ 1302 does not list this as a consequence of failing to register).

*Exhaustion*

The government acknowledged at oral argument that I had the authority to grant Fong's habeas corpus petition and order her returned to the United States, if not for the issue of exhaustion. "Obviously, it's within the Court's power to order her returned to the United States. It's, however, we think something that in this circumstance may well be beyond the Court's jurisdiction to do so, given her failure to exhaust the remedies that were available to her to challenge her removal order." Tr. Feb. 9, 2004, at 22. The government thus acknowledges that Fong's deportation does not render the issue moot. *See Swaby v. Ashcroft*, 357 F.3d 156 (2d Cir.2004) (habeas corpus petition not mooted by petitioner's deportation, even where ruling in petitioner's favor on the ultimate merits may not be likely). The government also acknowledges that jurisdiction over a habeas corpus appeal of a removal order is normally appropriate under 28 U.S.C. § 2241. *See Zadvydas*, 533 U.S. at 687–88, 121 S.Ct. 2491; *Calcano–Martinez v. INS*, 232 F.3d 328, 337 (2d Cir.2000).

■ The government argues that to challenge an in absentia deportation order for lack of notice, an alien must first move the Immigration Court to reopen the proceedings, and the denial of such a motion must be appealed to the Board of Immigration Appeals. Because the filing of a motion to reopen automatically stays removal of the alien, *see* 8 C.F.R. § 1003.23(b)(4)(ii), the government argues that even had Fong filed her motion during her detention, instead of filing her habeas corpus petition, it would have been effective to stay her deportation, and that therefore her failure to file a motion to reopen constituted a failure to exhaust. Thus, the government argues, Fong's failure to exhaust bars her from seeking habeas relief under 28 U.S.C. § 2241.

The government's argument is based on two decisions of the Second Circuit, *Beharry v. Ashcroft*, 329 F.3d 51, 56 (2d Cir. 2003), and *Theodoropoulos v. INS*, 358 F.3d 162 (2d Cir.2004). Beharry, a native of Trinidad and a lawful permanent resident in the United States, was convicted of robbery. In the deportation proceedings that followed his prison sentence, he claimed that he had the right to apply for discretionary relief under 8 U.S.C. § 1182(h). The Second Circuit held that "because petitioner failed to exhaust his administrative remedies, neither the district court nor this Court has subject matter jurisdiction to consider his claim for [such] relief." *Beharry, 329 F.3d* at 53. The court ruled, "[A] party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself." *Id.* at 56 (quoting *Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995)). This rule of exhaustion is compelled both judicially and by statute. *Id.* at 63; *see* 8 U.S.C. § 1252(d)(1).[4]

In *Theodoropoulos v. INS*, 358 F.3d 162 (2d Cir.2004), another case involving an immigrant convicted of a felony who challenged, via habeas corpus, his order of removal, the Second Circuit held that "the limitations imposed by [8 U.S.C.] § 1252(d)"—the exhaustion statute—"extend to habeas corpus review." *Id.* at 170. Thus, administrative remedies must be ex-

---

4. The governing statute in *Beharry* was 8 U.S.C. § 1105a(c), a transitional provision under IIRIRA, which required exhaustion of administrative remedies before attacking a removal order in federal court. The Court not-ed that provision's similarity to 8 U.S.C. 1252(d)(1), the controlling exhaustion provision in *Theodoropoulos v. INS*, 358 F.3d 162 (2d Cir.2004), and in the instant case.

hausted before a habeas corpus challenge to a removal order may be brought.

Fong's case differs from *Theodoropoulos* and *Beharry* in several ways. First, in *Theodoropoulos*, the petitioner waived his right to appeal explicitly and on the record, thus foregoing his right to exhaust his administrative remedies. 358 F.3d at 169. In *Beharry*, the petitioner had had a full opportunity to raise arguments in an administrative setting and failed to do so. 329 F.3d at 56. Fong, in contrast, was unable to exhaust her administrative remedies. The government, by quickly removing her from the United States, effectively prevented her from petitioning to reopen the in absentia removal order against her. Her efforts had to be focused on obtaining a stay of the removal order, and on the best chance to obtain such relief, from a United States District Court. It is entirely unrealistic to believe, as the government now contends, that she could have filed a motion to reopen her proceedings in those few brief hours before her removal.[5] In the circumstances, an administrative remedy cannot be said to have been "available" or "accessible." *See Booth v. C.O. Churner, et al.*, 532 U.S. 731, 737, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (defining "available" as "having sufficient power or force to achieve an end," "capable of use for the accomplishment of a purpose," and

that which "is accessible or may be obtained)." For Fong, a motion to reopen was not "accessible," obtainable, or "capable of use," and as such lacked any "power or force to achieve an end."[6] *Id.; see also Beharry*, 329 F.3d at 58 (cases may be outside "the parameters of" the exhaustion requirement). As the Supreme Court indicated in *INS v. St. Cyr*, 533 U.S. 289, 300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), when an individual's personal liberty is at stake, this Court will not exalt form over substance and reduce the procurement of that liberty to a game of checking the correct box, particularly when the individual is given a vanishingly brief time in which to procure counsel to determine which box to check. *See also Theodoropoulos*, 358 F.3d at 170 (distinguishing its holding from *St. Cyr* on the grounds that the latter presented "a substantial constitutional question").

 In any event, it is doubtful that exhaustion requires a motion to reopen. In *Zhang v. Reno*, 27 F.Supp.2d 476, 477 (S.D.N.Y.1998), Judge Rakoff held that "a motion to reopen, as a discretionary remedy, does not fall within the statutory exhaustion requirement, which provides that an alien must exhaust only those administrative remedies available 'as of right.'" *See also Charles v. Reno*, 117 F.Supp.2d

---

5. Given the exigencies of finding a lawyer, communicating with him or her, having the lawyer do the necessary factual and legal research, and writing and filing a motion, it is reasonable for a petitioner to place her trust in a District Court's Order rather than in what is claimed to be an automatic stay of removal, to be effected by the very agency that employed subterfuge in enticing her to come to its offices and which was in the midst of removing her.

6. The government likens this case to *United States v. Zelaya*, 293 F.3d 1294 (11th Cir. 2002), where defendant claimed that he was "factually and legally incapable" of seeking administrative remedies, since he allegedly

learned of his in absentia deportation order when he was arrested on May 10, 1997, and was deported five days later. The Eleventh Circuit rejected this argument, holding that "he had a sufficient opportunity to petition for administrative relief" and that "[h]e therefore failed to exhaust available administrative remedies." *Id.* at 1297. The comparison between *Zelaya* and the instant case ignores the critical difference between what may practically be expected in one day and what is possible in five. This distinction is crucial to determining whether petitioner "had a sufficient opportunity to petition for administrative relief," *id.*, and I therefore decline to find *Zelaya* dispositive.

412, 415 (D.N.J.2000) (same, under 8 U.S.C. § 1252(d)(1)). Thus, because a motion to reopen is a discretionary remedy, it does not come under the ambit of § 1252(d)(1), and Fong did not fail the exhaustion requirement.

For all these reasons, I hold the exhaustion requirement of 8 U.S.C. § 1252(d)(1) inapplicable to this case.

*Conclusion*

For the reasons stated, I grant Fong's habeas corpus petition and order that she be returned to the United States, thereby to allow her to pursue such administrative remedies as may be available to her. She is entitled to pursue whatever remedies she could have pursued in the 72 hours the regulations gave her, and such consequences that would normally arise from pursuit of those remedies. No legal prejudice shall flow from her removal; her claims are to be adjudicated as they would have been prior to September 18, 2003.

SO ORDERED.